UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 18 CR 232-7 |
| | ) | |
| JONATHAN REYNA | ) | Judge Rebecca R. Pallmeyer |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Defendant Jonathan Reyna, who has been indicted for crimes related to a narcotics trafficking conspiracy, moves to suppress evidence gathered as a result of a wiretap that the then-Chief Judge authorized in 2018 under 18 U.S.C. § 2518(10)(a) [862]. Reyna argues that the court abused its discretion by granting the government's application to intercept his communications because, in that application, law enforcement failed to demonstrate necessity for a wiretap as required by 18 U.S.C. § 2518(10)(c). For the reasons discussed below, Reyna's motion to suppress is denied.

## BACKGROUND

On February 12, 2018, then-Chief Judge Ruben Castillo of this court authorized a wiretap under 18 U.S.C. § 2518 for three cell phones, including Target Phone 7, which at times was used by Defendant Jonathan Reyna. To support its application to intercept communications on Target Phones 6, 7, and 8, the government submitted a 107-page affidavit written by Jacob Cowan, a Special Agent with the Federal Bureau of Investigation who personally participated in the investigation of Reyna and his co-conspirators. (Cowan Aff. ("Aff."), Ex. A to Reyna's Mot. [863].) In his affidavit, Agent Cowan describes the steps law enforcement officers took and the evidence they obtained during a nearly eight-month investigation into a narcotics trafficking conspiracy on Chicago's west side. The wiretap portion of the investigation began when law enforcement officers intercepted communications to and from phones used by co-defendant Devontay Johnson, from whom undercover law enforcement officers had purchased heroin and MDMA pills

on several occasions. (*Id*. ¶ 18–19.) From those calls and physical surveillance, agents identified co-defendant Corey Benson as one of Johnson's narcotics suppliers. (*Id*. ¶ 19.) The government then obtained authorization to intercept communications to and from a phone that Benson used. (*Id*. ¶ 20.) Law enforcement officers then used information they learned from Benson's intercepted calls and physical surveillance to work their way further up the narcotics distribution chain, which led them to identifying Defendant Reyna as one of Benson's narcotics suppliers. (*Id*.)

The affidavit asserts that intercepting wire communications over Target Phone 7 was necessary to fulfill the investigation's overall objectives (*id*. ¶ 133), which included (1) identifying Reyna's sources of narcotics supply, (2) identifying locations that Reyna and others used to receive, store, and process bulk quantities of narcotics and narcotics proceeds; and (3) dismantling the overall drug trafficking organization that Reyna and others operated. (*Id*. ¶ 132.)

The affidavit describes a number of investigative techniques that law enforcement employed up to the date of its application. It explains how, with the benefit of prior wiretaps, law enforcement was able to conduct physical surveillance of Reyna and others. For example, officers identified Reyna as the user of Target Phone 7 in part based on officers' observations of Reyna talking on his phone while law enforcement simultaneously intercepted a telephone call between Benson and the until-then-unidentified user of Target Phone 7. (Aff. at p. 55 n.21.)

The affidavit also includes information that agents learned from physical surveillance of Reyna, including, for example, information identifying one of his vehicles. (Aff. ¶ 156.) As Agent Cowan's affidavit explained, law enforcement's ability to physically surveil suspects during the investigation proved difficult because Reyna and his co-conspirators constantly monitored their surroundings for the presence of law enforcement. (*Id*. ¶¶ 136–37.) Additionally, the affidavit noted, traditional investigative techniques like physical surveillance and mobile tracking were of limited use because such techniques did not reveal the identity of person(s) any individual was

2

meeting with, the nature of the meeting, or transactions that occurred during such a meeting. (*Id*. ¶ 158.)

In addition to recounting officers' physical surveillance efforts, the affidavit discusses additional investigative techniques law enforcement employed prior to the wiretap application, including the use of undercover agents (Aff. ¶ 139), a confidential source (*id*. ¶ 140), pole cameras (*id*. ¶¶ 165–66), pen registers (*id*. ¶ 127), mobile tracking devices (*id*. ¶ 155), and mail cover requests (*id*. ¶¶ 160–61). It also discusses the investigative techniques that law enforcement considered but chose not to use against Reyna due to safety or practicality concerns, including grand jury subpoenas (*id*. ¶ 143), consensual interviews (*id*. ¶ 144–46), search warrants or consensual searches (*id*. ¶ 147–51), and trash seizures (*id*. ¶ 159).

## DISCUSSION

### I. Legal Standard

"Title III of the Omnibus Crime Control and Safe Streets Act of 1968 established a comprehensive statutory regime by which the Government may intercept wire, oral or electronic communications." *United States v. Martin*, 618 F.3d 705, 714 (7th Cir. 2010) (citations omitted). "Before using a wiretap to gather evidence of crimes, the government must apply for court authorization and its application must meet certain statutory requirements." *United States v. Mandell*, 833 F.3d 816, 820 (7th Cir. 2016) (citing 18 U.S.C. §§ 2516, 2518(1)). The government should strictly adhere to these requirements, s*ee United States v. Chavez*, 416 U.S. 562, 580 (1974), the purpose of which is to ensure that wiretapping is not "routinely employed as the initial step in criminal investigation." *United States v. Giordano*, 416 U.S. 505, 515 (1974).

One of the statute's procedural requirements is that the government demonstrate the "necessity" of a wiretap. The law enforcement officer's application must include a "full and complete statement as to whether or not investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). Despite the name, absolute necessity—in the sense that the investigation cannot

proceed without a wiretap—is not required: the requirement "was *not* intended to ensure that wiretaps are used only as a last resort in an investigation, but rather that they are not to be routinely employed as the initial step in a criminal investigation." *United States v. McLee*, 436 F.3d 751, 763 (7th Cir. 2006) (emphasis in original) (citations and internal quotation marks omitted). "The government's burden of establishing that normal methods have not worked or are unlikely to work or would be too dangerous is not great, and we consider its supporting evidence in a practical and common-sense fashion." *United States v. Jones*, 56 F.4th 455, 473 (7th Cir. 2022) (quotation marks omitted), *cert. denied sub nom*. *Owens v. United States*, No. 22-6945, 2023 WL 2959482 (U.S. Apr. 17, 2023).

In determining whether to suppress Title III evidence, the court reviews the decision to grant the wiretap application for an abuse of discretion. *United States v. Maggard*, 865 F.3d 960, 967 (7th Cir. 2017). In so doing, the court gives "great deference" to the issuing judge's determination. *McLee*, 436 F.3d at 763. So long as the statements in the application on which the judge relied are supported by factual predicates, the judge's determination will not be disturbed. *Maggard*, 865 F.3d at 968. The court will, however, suppress evidence derived from intercepted conversations if the issuing court abused its discretion in granting the application. *United States v. Matthews*, 213 F.3d 966, 968–69 (7th Cir. 2000) ("Title III provides that intercepted communications may be suppressed if: (i) the communication was unlawfully intercepted; (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or (iii) the interception was not made in conformity with the order of authorization or approval.") (citing 18 U.S.C. § 2518(10)).

## II. The Necessity Requirement

### A. Investigation of an Offense

Mr. Reyna's motion is primarily premised on one argument: that suppression is required due to the government's alleged failure to explain how it exhausted traditional investigative techniques against Reyna specifically. (*See* Mot. to Suppress Title III Evidence ("Reyna Br.")

[862] at 6–7, 15; Jonathan Reyna's Reply in Supp. of his Mot. to Suppress Title III Evidence ("Reyna Reply") [867] at 1–5.) Reyna urges that the necessity requirement is determined on a person-specific basis. In support, he cites three cases. The first, an unreported 2006 opinion from a federal district judge in Kentucky, states that the protections of § 2518 "are directed at individuals, not groups; therefore, the Court must examine the investigations of those individuals." *United States v. Rice*, No. 3:04CR-83-R, slip op. at 2 (W.D. Ky. Jan. 17, 2006). The *Rice* court does not support that observation with language from the statutory text or other analysis, however. And the other cases Reyna cites to support his proposed standard are also not controlling. In *United States v. Carneiro*, 861 F.2d 1171, 1177 (9th Cir. 1987), the Ninth Circuit reversed in part a district court's denial of a suppression motion because the lower court did not adequately assess whether each individual wiretap application in a set independently satisfied the necessity requirement. The court was concerned by "material omissions and misstatements" in some of the wiretap applications, and cited Ninth Circuit authorities for the statement that "there must be a showing of necessity with respect to each telephone and conspirator." *Id.* at 1182 (citing Ninth Circuit authorities). In *United States v. Castillo-Garcia*, 117 F.3d 1179, 1187–88 (10th Cir. 1997), overruled on other grounds by *United States v. Ramirez-Encarnacion*, 291 F.3d 1219 (10th Cir. 2002), the Tenth Circuit articulated a similar rule. There, the Tenth Circuit affirmed in part and reversed in part a district court order granting the defendants' suppression motion, holding that a showing of necessity must be made with respect to the target of each proposed wiretap and must be stated with particularity. *See id.*

As this court understands the standard in this circuit, the statute requires a showing of necessity for each wiretap; but it does not require law enforcement officers to articulate how they exhausted all traditional investigative techniques with respect to each individual whose communication is to be intercepted. As set forth in the statute, before granting a wiretap application, a judge must find that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C.

5

§ 2518(3)(c). The text of § 2518 does not include a requirement that law enforcement detail investigative procedures pursued against any specific individual; the statutory language instead focuses on whether a wiretap is necessary to investigate a specific offense. *See id.* at § 2518(1)(b) (requiring a wiretap application to include "details as to the *particular offense*" under investigation and the "identity of the person, if known, committing the offense") (emphasis added).

Thus, the relevant question for determining whether the government has met Title III's necessity requirement is whether intercepting calls from a particular phone is necessary to further the investigation of an offense—here, a conspiracy to traffic narcotics. On multiple occasions, the Seventh Circuit has repeated that it has upheld the necessity of wiretap orders on the basis that investigators were "having trouble fingering other members of the conspiracy," *United States v. Farmer*, 924 F.2d 647, 652 (7th Cir. 1991), and that wiretaps "allowed the government to ascertain the extent and structure of the conspiracy." *United States v. Pescia*, 48 F.3d 1452, 1463 (7th Cir. 1995). *See also United States v. Santiago*, 905 F.3d 1013, 1023 (7th Cir. 2018) (wiretap necessary for identifying those working with individual whose phone was tapped); *McLee*, 436 F.3d at 763 (same). Thus, a court may grant a Title III application that would enable law enforcement to identify yet-unknown individuals participating in a conspiracy. Reyna's proposed standard would require law enforcement to identify and investigate individuals before permitting any interception of their communications—but interception may be necessary to ascertain the identity of those very same individuals. The standards are irreconcilable.

Practical concerns work against Mr. Reyna's approach for an additional reason. The Seventh Circuit has repeatedly stated that, when reviewing the necessity of a wiretap, the court "look[s] at each case individually, considering the practicalities of each investigation and using our good reason and common sense." *Maggard*, 865 F.3d at 968 (quoting *United States v. Campos*, 541 F.3d 735, 749 (7th Cir. 2009)). It would defy common sense to require law enforcement to exhaust investigative efforts against every individual higher up in a narcotic trafficking organization (like Reyna) when traditional investigative efforts have proven ineffective

6

or dangerous against individuals who occupy lower-level roles (like Benson and Johnson). *See, e.g.*, *United States v. Fudge*, 325 F.3d 910, 919 (7th Cir. 2003) (deeming a wiretap "instrumental in filling the gaps and securing critical evidence against the conspirators" of a drug trafficking conspiracy because it allows law enforcement to "view the big picture, from the top of the organization to the lowest rung").

### B. The Cowan Affidavit

Seventh Circuit law does require a showing that a wiretap is not the "initial step" in an investigation. Mr. Reyna has not argued that this principle was violated in connection with the wiretap of Target Phone 7, and the affidavit makes clear that there was no violation. Intercepting communications on Target Phone 7 was far from law enforcement's first investigative step in that investigation—or even the investigation into Mr. Reyna's conduct specifically. A look at each of Reyna's challenges to the affidavit confirms this.

First, Mr. Reyna argues that law enforcement failed to physically surveil Reyna before seeking a wiretap and that the affidavit fails to explain why such surveillance would be too dangerous or unlikely to succeed. The affidavit does explain, however, that Reyna and his co-conspirators were "always on the look-out for law enforcement" and effectively evaded physical surveillance efforts. (Aff. ¶ 137.) Reyna faults the affidavit for failing to specify how he, personally, engaged in counter-surveillance tactics. Instead of presenting an example of Reyna's own behavior, the affidavit offers an example of how co-defendant Cedric Williams sped away at speed upwards of 100 mph from law enforcement as they observed Williams deliver crack cocaine to Johnson. (*Id.*) While the statute requires law enforcement to include "a full and complete statement of facts," 18 U.S.C. § 2518(1)(b)–(e), the statute does not forbid the use of examples in a supporting affidavit. Undoubtedly, more detail is always preferred. But law enforcement was not required to list every instance of counter-surveillance techniques employed by each member of the conspiracy in cinematic detail, and the government's statements about the co-conspirators' counter-surveillance techniques supported Judge Castillo's decision here. It was not an abuse of

discretion for Judge Castillo to find that physical surveillance of Mr. Reyna, at that point in the investigation, was impractical or too dangerous.

Second, Mr. Reyna argues that law enforcement's failure to use additional physical surveillance techniques to investigate Reyna warrants suppression because such surveillance would have "eliminated the need or necessity" for intercepting calls on Target Phone 7. (Reyna Br. at 9 (citing *United States v. Kahn*, 415 U.S. 143, 153 & n.12 (1974).) Reyna notes that, as reflected in the affidavit, by the time law enforcement officers sought Title III authority, they already knew the time, place, and location of a planned transaction between Reyna and Benson, and yet the affidavit does not explain whether law enforcement tried to observe that meeting or why doing so would not have been fruitful. (Reyna Br. at 9–10.) Similarly, Reyna argues that, had agents performed a cursory investigation to uncover Reyna's home address, they could have set up physical surveillance there prior to the wiretap (instead of surveilling the home, as they did, afterward). (Reyna Br. at 11–12.) Reyna insists that these failures show that the government did not exhaust traditional investigative techniques. (Reyna Br. at 6, 8, 10, 14.) And Reyna goes on to argue that, if traditional investigative techniques are bearing any fruit—as he contends they were here—a wiretap is premature. (Reyna Reply at 2, 3.)

These arguments rely on a legal standard that is not consistent with Seventh Circuit law. As noted above, the Seventh Circuit has instructed that although wiretaps "are not to be routinely employed as the initial step in a criminal investigation," § 2518(1)(c) "was *not* intended to ensure that wiretaps are used only as a last resort in an investigation." *Santiago*, 905 F.3d at 1023 (emphasis in original) (internal citations omitted). The Seventh Circuit has not held that, so long as traditional investigative efforts have been successful or could bear any fruit, the court may not grant a wiretap. Mr. Reyna suggests several ways the investigation could have been carried out differently, but those suggestions do not defeat the showing that intercepting calls from Target Phone 7 was not the first step in the government's investigation—and that is "the evil we are trying to avoid." *Campos*, 541 F.3d at 735.

8

Third, Mr. Reyna challenges the sufficiency of the affidavit's discussion of undercover agents and confidential informants. (Reyna Br. at 12.) The court disagrees with Reyna that the affidavit offers little more than a conclusory statement on this topic. The affidavit states that law enforcement was able to use undercover officers to purchase narcotics from Johnson, but not from Benson (to whom Reyna supplied narcotics). (Aff. ¶ 139.) As explained in the affidavit, undercover officers were limited to dealing with Johnson, which is not uncommon; "[b]ecause drug trafficking organizations typically compartmentalize their operations, an undercover agent posing as a customer or courier will have access only to those organization members directly involved in a particular drug delivery or sale, and not the supplier of the drugs." (*Id.*) The affidavit further states that law enforcement used a confidential informant but "it [was] both highly unlikely and dangerous for a confidential source or an undercover agent to attempt to infiltrate the upper echelons of [the narcotics trafficking] organization." (*Id*. ¶ 140.) Because Reyna, due to his higher-ranked position, was relatively insulated from undercover agents and the confidential source, it was reasonable for Judge Castillo to find that further pursuing such tactics against Reyna would have been dangerous or unlikely to succeed; that conclusion accords with the practicalities of the investigation and common sense. *See McLee*, 436 F.3d at 762–63.

Mr. Reyna's remaining arguments similarly stray from Seventh Circuit law. Mr. Reyna urges that the affidavit is "replete with general statements unsupported by facts," and he argues repeatedly that the affidavit uses "boilerplate language and blanket assertions" that cannot establish necessity under the statute. (*See* Reyna Br. at 8, 14.) On this point, Reyna again cites out-of-circuit authorities.[1] Under Seventh Circuit law, an application may include statements about agents' general investigative experience in the type of crime involved, so long as the

---

[1] Reyna cites *Castillo-Garcia*, 117 F.3d at 1187–88; *United States v. Fletcher*, 635 F. Supp. 2d 1253, 1259 (W.D. Okla. 2009); *United States v. Ippolito*, 774 F.2d 1482, 1486 (9th Cir. 1974); *United States v. Blackmon*, 273 F.3d 1204, 1210 (9th Cir. 2001); *United States v. Ashley*, 876 F.2d 1069 (1st Cir. 1989). Notably, both Ninth Circuit cases review the district court's decision under a de novo standard of review rather than the Seventh Circuit's abuse-of-discretion standard. *See Ippolito*, 774 F.2d at 1484; *Blackmon*, 273 F.3d at 1207.

affidavit also discusses the particular facts of the case at hand. *Campos*, 541 F.3d at 749. In this circuit, the court will affirm a finding of necessity under § 2518(3)(c) so long as "there existed a factual predicate for that finding in the affidavit." *Maggard*, 865 F.3d at 968 (brackets and quotation marks removed).

The 107-page affidavit at issue here meets that standard. The affidavit discusses investigative techniques that officers had used or ruled out during the conspiracy investigation, including (1) administrative and grand jury subpoenas; (2) consensual interviews of subjects of the investigation; (3) pen registers and telephone toll records; (4) trash seizures; and (5) mail cover requests. First, the affidavit states that grand jury subpoenas were not practical at the time for several reasons, including the concern that service of such subpoenas would alert other members of the conspiracy to the existence of the investigation. (Aff. ¶ 143.) Second, the affidavit stated that consensual interviews would be of limited value in light of the difficulties officers faced when interviewing individuals in a related investigation. (*Id*. ¶ 144.) Third, the affidavit notes that pen registers were of limited value because the phones were subscribed to by people other than the individuals believed to be using them to conduct drug transactions; for example, Target Phone 7 was not registered under Reyna's name. (*Id*. ¶ 153.) Fourth, the affidavit states that trash seizures were "unlikely to produce evidence revealing the identities of all the members of a drug trafficking organization or the full nature and scope of the drug trafficking organization's criminal activities" because Reyna and his co-defendants "continually seem to be at different locations," so that pulling trash from addresses associated with those individuals would not be worth the risk of detection from neighbors and the suspects' associates.[2] (*Id*. ¶ 159.) Fifth, the affidavit states

---

[2] Reyna argues that Judge Castillo should not have accepted the affidavit's assertion that law enforcement could not locate Reyna's home address; Reyna states that he lived at the same address "virtually all his life," and the address is listed on his driver's license, FOID, and CCL. (Reyna Br. at 11.) Access to Reyna's permanent residence address is not dispositive on this issue. As reported in the affidavit, in the weeks leading up to the government's wiretap application, law enforcement tracked the location of Target Phone 7 (Aff. ¶ 127), and even with that information law enforcement was not "able to identify reliable addresses for [Reyna and others] for any length of time" because Reyna and the others "continually seem[ed] to be at

that law enforcement obtained information from the United States Postal Inspection Service that Reyna and his co-conspirators were using the USPS to receive illegal narcotics and described an incident where officers tried to intercept a package, but were unable to do so because, postal inspectors believe, it was rerouted. (*Id.* ¶ 160.) As these examples show, the affidavit's statements are supported by factual predicates, even if those factual predicates are not articulated with the level of detail Mr. Reyna would prefer. Based on the affidavit, it was reasonable for Judge Castillo to conclude that traditional investigative techniques would not suffice to expose the details of the narcotics conspiracy under investigation and the extent of Mr. Reyna's participation therein. *See Khan*, 415 U.S. at 153 n.12. The court finds no abuse of discretion in then-Chief Judge Castillo's finding that traditional investigative techniques were unlikely to succeed or too dangerous, and therefore authorizing a wiretap of Target Phone 7.[3]

## CONCLUSION

Defendant Reyna's motion to suppress Title III evidence is denied.

ENTER:

Dated: May 1, 2023

_____
REBECCA R. PALLMEYER
United States District Judge

---

different locations." (*Id.* ¶ 159.) As the government stresses in its response brief, "the fact that defendant had a driver's license and vehicle registered to an address in Berwyn, Illinois did not necessarily mean that defendant was actually residing at that residence or, more importantly, that defendant was conducting his drug trafficking activities at that residence." (Gov't Resp. [866] at 12.)

[3] The government argues in the alternative that, if necessity were lacking, suppression would be inappropriate because agents relied in good faith on the existence of a facially valid order. (Gov't Resp. [866] at 13 (citing *United States v. Leon*, 468 U.S. 897, 914–23 (1984).) Reyna contests the applicability of the good-faith exception to Title III's suppression provision, but because the court finds no abuse of discretion, it declines to address the issue.